

DA 06-0284

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 273

STATE OF MONTANA,

Plaintiff and Appellee,

v.

THOMAS EUGENE TUCKER, JR.

Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-03-335
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jim Wheelis, Chief Appellate Defender, Roberta R. Zenker,
Assistant Appellate Defender; Helena, Montana

For Appellee:

Hon. Mike McGrath, Montana Attorney General, Tammy Plubell,
Assistant Attorney General; Helena, Montana

Fred Van Valkenburg, Missoula County Attorney, Kirsten L. LaCroix,
Deputy County Attorney; Missoula, Montana

Submitted on Briefs:  October 17, 2007

Decided:  August 5, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Thomas Eugene Tucker, Jr. appeals from the final judgment and order of the District Court for the Fourth Judicial District, Missoula County, denying his motion to suppress evidence seized from his residence pursuant to a search warrant.  We affirm.

¶2    The issues on appeal are as follows:

1.  Did the District Court err in concluding there was sufficient probable cause in the application for search warrant when it denied Tucker's motion to suppress?

2.  Did the District Court abuse its discretion in failing to conduct a hearing on Tucker's motion to suppress, pursuant to § 46-13-302(2), MCA?

3.  Alternatively, if it was necessary for Tucker to have requested a hearing on his motion to suppress, did defense counsel render ineffective assistance in failing to do so?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On December 4, 2002, Detective Richard J. Maricelli of the Missoula County Sheriff's Department applied for a warrant to search Tucker's residence located at 19505 Pond Road in Frenchtown, Montana.  Detective Maricelli filed the application for search warrant acting on the belief that Tucker had committed the offenses of criminal defamation and sexual abuse of children.  Detective Maricelli based the application on information obtained from two different sources—Eric Belker, a Frenchtown resident who had hired Tucker to do drywall work on the Belker's family home, and Tucker's ex-fiancée, Aleece Sobrio.  Detective Maricelli set forth the following facts as grounds for the search warrant in the application.

¶4     The application stated that on November 7, 2002, a Missoula County Sheriff's deputy responded to a call complaining of criminal defamation in Frenchtown, Montana. The officer met with Eric Belker. Belker informed the officer that someone had placed thirty slanderous letters in area mailboxes. Belker suspected that Tucker had distributed the anonymous letter. In March of 2002, Belker had criminal charges brought against Tucker for deceptive practices, related to the drywall work Belker had hired Tucker to complete. The charge stemmed from Belker's contention that Tucker failed to complete the job in a timely manner, despite numerous extensions and receiving his fees up front. Belker also alleged that his wife Virginia had caught Tucker in their young daughter's bedroom with a pair of their daughter's underwear in his hand. The application stated that Tucker did not seem to have a reasonable explanation for this and told Virginia that he picked them up off the floor so that he would not step on them. In the application, Belker also said that Tucker worked at the Frenchtown High School but was fired when he was discovered to be a registered sex offender. Belker had not known about Tucker's dismissal until the assistant principal contacted Belker and informed him that Tucker had contacted the assistant principal inquiring if Belker was responsible for disclosing Tucker's registered sex offender status to the school.

¶5     The anonymous letter made several allegations concerning Belker, a retired California police officer, including that Belker had "gunned down a young innocent child" while serving in California, that Belker had an extremely violate nature and quick temper, that Belker came to Montana to hide his crime, as well as numerous other allegations of a similar nature. The application stated that the shooting was determined to

3

be justified as an "in the line of duty shooting" and Belker was cleared of any criminal or civil charges. Belker also related that he had disclosed the details of the shooting with only a few of his closest friends, and not Tucker. Belker speculated that Tucker learned of the incident while snooping around the Belker's residence. A copy of the letter was included with the application.

¶6 The application further detailed that a week after Belker contacted the sheriff's office, Detective Maricelli received a copy of a letter sent by Tucker's ex-fiancée Aleece Sobrio to Deputy Missoula County Attorney Kirsten LaCroix. While the application did not identify Sobrio by name, it did refer to her as Tucker's ex-fiancée. The application summarized the contents of the letter, including that Sobrio and Tucker had met on the internet in 2001 and she had eventually moved from Utah to Montana to be with him. Shortly thereafter, she and Tucker had gotten engaged and planned to marry. The relationship began to deteriorate when she learned that Tucker was a registered sex offender and that he had an "exorbitant" amount of pornography, both in his bedroom and in a camper/trailer located on the property. The application stated that Sobrio had found a number of young girl's undergarments in Tucker's possession, as well as depictions of what she believed to be underage girls in pornographic DVDs, videos, magazines, and computer images. For these reasons and due to what she said was Tucker's violent temper and controlling nature, the marriage had been called off and Sobrio had sneaked out of Tucker's residence at night and returned to Utah. The application stated that Sobrio would be willing to testify against Tucker. Detective

4

Maricelli also stated in the application that he was in constant contact with Sobrio and could reach her if needed for further information.

¶7 The application also noted that Sobrio informed Maricelli that she assisted Tucker in the distribution of a defamatory letter, similar to the one distributed regarding Belker, only this time directed at the Frenchtown Fire Chief, Scott Waldron. Sobrio claimed that Tucker wrote the letter at his residence on either the family computer or his laptop, and she drove his vehicle while he distributed the letters around the Frenchtown area. The application stated that Maricelli contacted Waldron and confirmed that such a letter had been distributed. Waldron provided Maricelli with a copy of the letter and Maricelli attached a copy to the application.

¶8 The application attached photographs of, and described in detail, Tucker's residence on Pond Road in Frenchtown and the structures found on the land, including the trailer noted by Sobrio. Detective Maricelli stated that he had confirmed Tucker resided at the Pond Road residence, as it was the same address Tucker had provided for his sex offender registration. Based on the foregoing information and his knowledge and experience, Maricelli believed that a search of Tucker's residence would result in locating not only evidence of the Belker letter, including the computer used in its creation, but also child pornography.

¶9 District Court Judge John Larson reviewed and approved the application for a search warrant on December 4, 2002. The following day, Detective Maricelli and four other law enforcement officers searched Tucker's residence, and seized numerous pornographic videotapes and magazines, as well as several computer disks that were later

determined to contain child pornography. Copies of the Belker letter were also found in the search, although Tucker was ultimately not charged with criminal defamation.

¶10 On August 28, 2003, the State charged Tucker by Information with one count of sexual abuse of children, in violation of § 45-5-625, MCA, as a result of images found on the seized computer disks. The State filed an Amended Information on January 27, 2004, charging Tucker with thirty-four counts of sexual abuse of children. This Amended Information resulted from a further review of compact discs seized in the December 5, 2002 search of Tucker's residence. A second Amended Information followed on February 3, 2004, which detailed the grounds for each separate count against Tucker.

¶11 A series of procedural motions followed, including two versions of a motion to suppress the evidence seized during the December 5, 2002 search of Tucker's residence. Tucker contended that the December 4, 2002 application for search warrant failed to establish probable cause to issue a search warrant because it contained insufficient facts and did not meet the criteria set out by this Court in *State v. Reesman*, 2000 MT 243, 301 Mont. 48, 10 P.3d 83 (overruled in part by *State v. Barnaby*, 2006 MT 203, 333 Mont. 220, 142 P.3d 809). Days before the scheduled trial date, the District Court denied Tucker's motion to suppress. The court concluded that based on the totality of the circumstances, there was sufficient probable cause in the application for search warrant.

¶12 The District Court held a jury trial on August 29-30, 2005, and the jury found Tucker guilty on thirty of the thirty-four counts of sexual abuse of children. The District Court sentenced Tucker on March 2, 2006, to ten years on each count with all but thirty years suspended. This appeal followed.

**STANDARD OF REVIEW**

¶13 We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether its interpretation and application of the law are correct. *State v. Zito*, 2006 MT 211, ¶ 6, 333 Mont. 312, ¶ 6, 143 P.3d 108, ¶ 6. Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed. *State v. Beaupre*, 2004 MT 300, ¶ 17, 323 Mont. 413, ¶ 17, 102 P.3d 504, ¶ 17. We review a district court's denial of an evidentiary hearing for a clear abuse of discretion. *State v. Schulke*, 2005 MT 77, ¶ 10, 326 Mont. 390, ¶ 10, 109 P.3d 744, ¶ 10. Claims of ineffective assistance of counsel are mixed questions of law and fact that we review de novo. *State v. Trull*, 2006 MT 119, ¶ 9, 332 Mont. 233, ¶ 9, 136 P.3d 551, ¶ 9.

**DISCUSSION**

¶14 ***Issue One. Did the District Court err in concluding there was sufficient probable cause in the application for search warrant when it denied Tucker's motion to suppress?***

¶15 Tucker argues that the facts in the application were not sufficient to establish probable cause regarding possession of child pornography because the police failed to corroborate information provided by what Tucker claims were two unreliable sources. Tucker contends that law enforcement failed to corroborate any of the information supplied by Belker and only corroborated the information provided by Sobrio about the letter regarding Fire Chief Waldron.

7

¶16   An application for a search warrant must state facts sufficient to show probable cause to believe an offense has been committed and that evidence of the crime may be found in the place to be searched.  Section 46-5-221, MCA; *State v. Barnaby*, 2006 MT 203, ¶ 30, 333 Mont. 220, ¶ 30, 142 P.3d 809, ¶ 30; *State v. Reesman*, 2000 MT 243, ¶ 24, 301 Mont. 48, ¶ 24, 10 P.3d 83, ¶ 24.  We have adopted the "totality of the circumstances" test set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317 (1983), to evaluate whether probable cause supported the issuance of a warrant.  *Zito*, ¶ 7; *Barnaby*, ¶ 29.  Under the totality of the circumstances test, the issuing judicial officer must make a practical, common sense determination, given all the evidence contained in the application for a search warrant, whether a fair probability exists that contraband or evidence of a crime will be found in a particular place.  *Zito*, ¶ 7; *Barnaby*, ¶ 29; *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332.

¶17   A determination of probable cause does not require facts sufficient to make a showing of criminal activity, rather, the issuing judicial officer must only determine that there exists a probability of criminal activity.  *Barnaby*, ¶ 30.  Probable cause must be determined solely from the information contained within the four corners of the search warrant application.  *Zito*, ¶ 9; *Barnaby*, ¶ 30.  Furthermore, as a reviewing court, we must likewise look solely to the four corners of the search warrant application to determine if probable cause existed.  *State v. Morse*, 2006 MT 54, ¶ 12, 331 Mont. 300, ¶ 12, 132 P.3d 528, ¶ 12.  Our function as a reviewing court is to ensure ultimately that the issuing judicial officer had a "substantial basis" to determine that probable cause existed.  *Barnaby*, ¶ 30; *Reesman*, ¶ 19.  However, it is critical that an issuing judicial

8

officer's determination that probable cause existed be paid great deference and every reasonable inference possible be drawn to support that determination of probable cause. *Zito*, ¶ 8.

¶18 We have employed the *Reesman* test to determine whether a search warrant application was supported by probable cause. The *Reesman* test can be summarized as follows:

> First, if the informant is anonymous, independent corroboration of the informant's information is required. *Reesman*, ¶ 28. If the informant is not anonymous, the next inquiry is whether the informant's information is based on personal observation or hearsay. *Reesman*, ¶ 29. If based on hearsay, then independent corroboration is needed. *Reesman*, ¶ 30. If based on the informant's personal observation, we then address reliability by determining whether the informant has provided reliable and accurate information to officers in the past, whether the admission is against the informant's interest, or whether the informant was motivated by good citizenship. *Reesman*, ¶¶ 31-34.

*Beaupre*, ¶ 38.

¶19 We reexamined *Reesman* in *Barnaby*, and modifying the requirements mandated by the *Reesman* test, said "[t]he critical question when evaluating probable cause is not whether an individual report meets the requirements of a particular test, but whether the application as a whole states sufficient facts to support a determination of probable cause." *Barnaby*, ¶ 39. To that end, we must determine whether all the information found in the application amounted to a substantial basis for determining whether probable cause supported the issuance of the search warrant. *Barnaby*, ¶ 39. To facilitate this determination, we relaxed *Reesman*'s "strict rules" requiring independent police corroboration, as the totality of the circumstances test established in *Gates* requires

9

greater flexibility. *Barnaby*, ¶ 41. Independent police corroboration remains a key element in determining whether probable cause exists but we recognized in *Barnaby* that independent police work is not the only method of corroboration under the totality of the circumstances test. *Barnaby*, ¶ 42. However, *Reesman* "still provides useful guidelines to evaluate a warrant application . . . ." *Barnaby*, ¶ 41.

¶20 Turning to those guidelines, in situations where a search warrant application is based on information provided by an informant, the first inquiry is whether the informant was anonymous. *Reesman*, ¶ 28. If the informant is anonymous, then the information must be corroborated. *Reesman*, ¶ 28. Here, neither Belker nor Sobrio were anonymous. Belker was expressly named in the application and Sobrio was identified as Tucker's ex-fiancée and the application indicated that Detective Maricelli could contact her if law enforcement required additional information. Further, Sobrio expressed her willingness to testify against Tucker, as noted in the search warrant application.

¶21 Having determined that neither informant was anonymous, the next inquiry is whether the informant's information was based on personal observation or hearsay. *Beaupre*, ¶ 38; *Reesman*, ¶ 29. "The first-hand report of a concerned citizen generally represents reliable information." *Barnaby*, ¶ 31. If the information is based on the informant's personal observation, we then address the informant's reliability. *Beaupre*, ¶ 38; *Reesman*, ¶ 31. If the information is not based on personal observation, then corroboration is required. *Beaupre*, ¶ 38; *Reesman*, ¶ 30. However, "[t]he fact that the application for a warrant did not include a specific account of the circumstances under which some informants viewed the events, or whether the two citizens based their reports

10

on personal observations, does not preclude a court from finding probable cause." *Barnaby*, ¶ 46. In regard to corroboration, we have stated that it must "reveal indicia of human conduct that becomes suspicious when viewed in conjunction with the incriminating information received from the informant." *Zito*, ¶ 12.

¶22 Belker disclosed that he believed that Tucker was responsible for distributing the slanderous letter. Belker based this suspicion on his prior relationship with Tucker when Belker hired Tucker to do drywall work, the difficulties that ensued when Tucker failed to complete the work in a timely manner, and that Belker was currently involved in a criminal trial over this dispute. This historical information about the parties' previous relationship was based on personal knowledge. In regard to the information provided by Belker about his awareness of Tucker's discharge from employment at the Frenchtown High School due to Tucker's status as a registered sex offender, Officer Maricelli corroborated this in part by determining that Tucker was, in fact, a registered sex offender. We have held that a person's criminal history is "one of the many factors to be considered under the totality of the circumstances test." *Zito*, ¶ 16 (internal quotation marks omitted). The application also stated that Belker related how his wife, Virginia, discovered Tucker in their daughter's bedroom with a pair of her underwear in his hand, "and didn't seem to have a reasonable answer as to why he was in the bedroom with the door closed." Tucker argues this information was hearsay and that the application contains no confirmation of these statements by Virginia. However, the application did contain information of a similar nature provided by Sobrio. She reported that she had discovered young girl's panties and undergarments in Tucker's possession in his

11

bedroom and trailer, thus providing consistent "indicia of human conduct" which had the corroborative effect of making Virginia's statements more probable and the alleged conduct more suspicious.

¶23 In regard to the information provided by Sobrio in the application, her observations of Tucker's possession of what she suspected to be child pornography, as well as possession of young girl's undergarments in his bedroom and camper-trailer, were personal observations. Tucker argues that law enforcement failed to corroborate the child pornography report, but because Sobrio's information was based on personal observations, and assuming she was a reliable source, discussed below, further corroboration would not have been necessary. Even so, Maricelli's investigation revealed Tucker to be a registered sex offender, and the panties incident in the Belkers' daughter's bedroom provided corroborative support which enhanced the probability that Sobrio's observations about child pornography were true. The application also detailed how Sobrio stated that she had assisted Tucker in distributing a defamatory letter against Fire Chief Waldron. Sobrio's observations and information in this regard were also based on personal experience and, again assuming her reliability, required no corroboration. Nonetheless, Detective Maricelli corroborated the report about the Waldron letter by contacting Waldron and obtaining a corroborative report. The Waldron letter incident also served to corroborate Belker's report concerning his belief that Tucker was behind the similarly distributed letter about Belker. The fact that Tucker had distributed by hand a critical letter similar to the Belker letter would supply the issuing judicial officer with an indicia of human conduct making Belker's report more probable.

12

¶24 The third step in the *Reesman* analysis is whether or not Belker and Sobrio were reliable informants. There are three categories of informants for the purposes of determining reliability: (1) confidential informants; (2) informants who make an admission against interest; and (3) concerned citizens. *State v. Palmer*, 2003 MT 129, ¶ 18, 316 Mont. 46, ¶ 18, 68 P.3d 809, ¶ 18. A confidential informant is not deemed reliable unless the informant has given reliable and accurate information in the past. *Palmer*, ¶ 18. If an informant makes an unequivocal admission against interest, further corroboration is not required. *Palmer*, ¶ 18. "Finally, informants motivated by 'good citizenship' are deemed reliable if they provide information that demonstrates a sufficient degree of the nature of the circumstances under which the incriminating information became known." *Palmer*, ¶ 18.

¶25 Here the application "contained the necessary information to establish the reason for [the informants'] personal exposure to the evidence," as well as their motivation in going to the police. *Beaupre*, ¶ 47. Belker was not a confidential informant because he is identified by name in the application. Belker was an apparent victim who was acting as a concerned citizen when he provided the information to the police about Tucker, and there is nothing in the record to the contrary. Belker had hired Tucker to perform work on the Belkers' home. Based on Belker's personal experience with Tucker, his wife's report about the underwear incident, and his knowledge that Tucker blamed him for Tucker's loss of employment at the Frenchtown High School due to Tucker's status as a sex offender, Belker had reasonable grounds on which to report his belief that Tucker was behind the defamatory letter. Because Belker was acting as a concerned citizen in

13

reporting this information to the police, he was a reliable informant and further corroboration was not required.

¶26 While Sobrio was not identified by name in the application, she was identified as Tucker's ex-fiancée and likewise cannot be classified as a confidential informant. She gained knowledge about the evidence stated in the application from her personal experience. She sent an unsolicited letter about Tucker to the county attorney's office and expressed her willingness to return to Montana and testify against Tucker. Sobrio was Tucker's fiancée and lived at Tucker's residence for a number of months. While living there, she personally observed that he possessed a large quantity of pornography. Sobrio eventually discovered that Tucker also possessed a number of young girl's undergarments, as well as what she suspected to be child pornography. Based on the foregoing information, it is clear Sobrio acted as a concerned citizen in reporting the information to law enforcement. In addition, Sobrio made an admission against interest when she stated that she assisted Tucker in the distribution of the defamatory letter against Fire Chief Waldron. Thus, Sobrio was properly considered a reliable informant.

¶27 The question is then whether the application as a whole supports a determination of probable cause. *Barnaby*, ¶ 42. Based on the totality of the circumstances, the issuing judicial officer had a substantial basis to determine that probable cause existed to search Tucker's residence given the information and evidence contained in the application. As both Belker and Sobrio were acting as concerned citizens (and in the case of Sobrio, making an admission against interest), they were both reliable informants. Further, even assuming that any additional corroboration was necessary, this was satisfied for the

reasons discussed herein. The reports of Belker and Sobrio corroborated each other and Detective Maricelli further corroborated their information by confirming that Tucker was a registered sex offender and that he and Sobrio distributed the Waldron letter. We conclude that the application demonstrated the necessary probable cause and that the District Court properly denied Tucker's motion to suppress.

¶28 ***Issue Two. Did the District Court abuse its discretion in failing to conduct a hearing on Tucker's motion to suppress, pursuant to § 46-13-302(2), MCA?***

¶29 Tucker claims that the District Court abused its discretion and committed structural error when it failed to hold a suppression hearing in accordance with § 46-13-302(2), MCA. A review of the procedural facts surrounding Tucker's motion to suppress is necessary to address this issue.

¶30 On June 1, 2004, Tucker filed a motion to suppress the evidence seized in the December 5, 2002 search, on the ground the warrant "lacked sufficient probable cause to believe that an offense had been committed and that evidence connected with the offense may be found at Tucker's residence." This motion was filed through Tucker's second counsel of record, Margaret Borg. Tucker subsequently became dissatisfied with Borg as his counsel and filed a pro se motion to dismiss on July 19, 2004. The court held an evidentiary hearing on October 20, 2004, regarding Tucker's pro se motion to dismiss and other outstanding motions, but announced it would not rule on the June 1, 2004 motion to suppress prepared by Borg because Tucker stated he was "appalled at its incompleteness." Borg withdrew as Tucker's counsel and he subsequently waived his

15

right of counsel. The court appointed Michael Bailey as standby counsel for Tucker and Bailey was ultimately appointed as Tucker's attorney on February 10, 2005.

¶31 On August 15, 2005, two weeks before the scheduled trial date, Tucker's new counsel filed another motion to suppress the evidence seized in the December 5, 2002 search. At an August 16, 2005 conference, the District Court announced that because Tucker's motion was focused on the four corners of the application, a factual hearing would not be necessary, and the court did not hold one. The District Court ultimately denied Tucker's motion to suppress as it concluded there was sufficient probable cause in the application.

¶32 Turning to Tucker's argument, in reference to a motion to suppress, § 46-13-302(2), MCA, states: "If the motion states facts that, if true, would show that the evidence should be suppressed, the court shall hear the merits of the motion at the omnibus hearing or at a later date if the court orders." Tucker argues that the language of this statute is "mandatory" and that the District Court did not determine whether the facts alleged in his motion to suppress, if true, were sufficient to warrant suppression. Tucker asserts that because the District Court failed to conduct a hearing, he was prejudiced as he would have had the opportunity to show "that both informants had vindictive motives to provide false information, or even 'set up' the Appellant." Tucker further claims that the failure to hold a hearing amounted to structural error and was presumptively prejudicial.

¶33 The State counters by arguing that Tucker based his motion to suppress on the theory that the application did not establish probable cause, which the State claims is a legal question that does not require a hearing. The State argues that when a defendant

challenges whether probable cause was established within the four corners of the search warrant application, as Tucker has done, § 46-13-302(2), MCA, is not implicated and, unless Tucker attempted to make a preliminary showing that a false statement had been made, a hearing was not required. The State contends that as Tucker did not attempt to make this showing in either of his motions to suppress, the District Court had no obligation to hold a hearing.

¶34 Except as where required by statute, a district court has discretion in holding a hearing on the merits of a motion. Section 46-13-104(2), MCA. Section 46-13-302(2), MCA, encompasses all motions to suppress evidence obtained by an allegedly unlawful search and seizure. *See* § 46-13-302(1), MCA. An evidentiary hearing would be required under 46-13-302(2), MCA, if the defendant's suppression motion "states facts that, if true, would show that the evidence should be suppressed . . . ." *State v. Schulke*, 2005 MT 77, ¶ 28, 326 Mont. 390, ¶ 28, 109 P.3d 744, ¶ 28. However, an evidentiary hearing is unnecessary where the facts are uncontested and the court is asked to make a decision as a matter of law. *Schulke*, ¶ 28. In *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978), the Supreme Court determined that a defendant may challenge the truthfulness of the factual statements made in an application for a search warrant. *Franks*, 438 U.S. at 164-65, 98 S. Ct. at 2681. We employ the *Franks* procedure for challenging the truthfulness of factual statements made in a search warrant application, as modified by this Court in *State v. Worrall*, 1999 MT 55, 293 Mont. 439, 976 P.2d 968.

¶35 Under the *Franks* procedure, the defendant must first make a substantial preliminary showing that false information was included in the search warrant

17

application. *State v. Minez*, 2004 MT 115, ¶ 22, 321 Mont. 148, ¶ 22, 89 P.3d 966, ¶ 22. To make the required substantial preliminary showing, the defendant must provide more than mere conclusory statements. *Minez*, ¶ 21. The substantial preliminary showing may be made by providing "an offer of proof containing affidavits, sworn testimony or other reliable witness statements which tend to prove the falsity of the information contained within the warrant application." *Minez*, ¶ 23. If the defendant makes this showing, then a hearing must be held at the defendant's request. *Minez*, ¶ 23. The defendant must prove by a preponderance of the evidence that the statement was false. *State v. Clifford*, 2005 MT 219, ¶ 58, 328 Mont. 300, ¶ 58, 121 P.3d 489, ¶ 58. If the defendant proves the statement is false, the offending material is excised, and the application is reviewed to determine whether probable cause continues to exist. *Minez*, ¶ 20. If probable cause does not continue to exist, the search warrant must be voided, and the fruits of the search excluded. *Minez*, ¶ 20.

¶36 Applying this procedure, Tucker failed to make *any* preliminary showing, let alone a substantial preliminary showing, of a false statement in his motion to suppress. The central claim of both Tucker's June 1, 2004 and August 15, 2005 motions to suppress is that the application did not contain facts sufficient to establish probable cause for the issuance of a search warrant. Nowhere in either motion is there any claim that the application contained false statements of fact. Although Tucker expressed his dissatisfaction with the first motion at the October 20, 2004 hearing and claimed that "all the statements used by the officer to obtain the search warrant are false," the revised August 15, 2005 motion did not contain any such allegation. At the August 16, 2005

conference regarding Tucker's renewed motion to suppress, Tucker's counsel Michael Bailey acknowledged that the court's review was limited to the four-corners of the application. Judge Larson later stated, "I still hear that we're focused on the application, the four corners of the application, so a factual hearing really isn't necessary, and Mr. Bailey, I assume, has raised all the arguments he's going to raise in his initial brief." Based on the plain language of both motions and the subsequent discussion at the conference, it is clear that Tucker did not challenge the truthfulness of any factual statement in the application.

¶37 Because Tucker challenged whether probable cause was established within the four corners of the search warrant application, but failed to make any preliminary showing of a false statement in the application, § 46-13-302(2), MCA, did not require the District Court to hold a hearing and apply a *Franks* analysis. As such, it was a matter of discretion for the District Court to order a hearing on Tucker's motion to suppress and the District Court did not abuse that discretion. Further, because the District Court was not required to hold a hearing on Tucker's motion, we need not address Tucker's contention that this constituted "structural error."

¶38 Finally, we also reject Tucker's contention that "the mandatory language of [§ 46-13-302(2), MCA] *suggests* that the district court should enter an explicit finding when it declines to conduct a suppression hearing." (Emphasis added.) Tucker cites no legal authority for this proposition, and our review of the language of the statute does not reveal the suggestion Tucker sees there, even if such a finding would be helpful. We

hold that the District Court did not err in failing to hold a hearing on Tucker's motion to suppress or to enter an explicit finding about its decision.

¶39    ***Issue Three.   Alternatively, if it was necessary for Tucker to have requested a hearing on his motion to suppress, did defense counsel render ineffective assistance of counsel in failing to do so?***

¶40    Tucker argues that if the District Court was not required to hold a suppression hearing under § 46-13-302(2), MCA, then his counsel's failure to request a hearing constituted record-based ineffective assistance of counsel.

¶41    When reviewing ineffective assistance of counsel claims, this Court applies the two-part test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).   Under *Strickland*, to prevail on an ineffective assistance of counsel claim, the defendant must show:   (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant.   *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, ¶ 10, 183 P.3d 861, ¶ 10.

¶42    The primary question under the first prong of *Strickland* is "whether counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances."   *Whitlow*, ¶ 20. Counsel's performance is strongly presumed to be within the wide range of reasonable professional assistance, and the defendant "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Whitlow*, ¶ 21.

¶43    A petitioner must satisfy both prongs of the *Strickland* test to prevail on an ineffective assistance of counsel claim.  *Adams v. State*, 2007 MT 35, ¶ 22, 336 Mont. 63,

20

¶ 22, 153 P.3d 601, ¶ 22. If petitioner makes an insufficient showing as to one prong of the test, then there is no need for the Court to address the other prong. *Adams*, ¶ 22.

¶44 Tucker notes that at the August 16, 2005 conference, the court informed both parties that it would make its decision based upon the briefs. Tucker claims that "[c]ounsel for Defendant failed to object and request a suppression hearing pursuant to Mont. Code Ann. § 46-13-302(2)." Tucker argues that as the suppression hearing would have been his strongest chance to demonstrate the "ill will and motives" of the two informants and undermine their reliability, the more reasonable standard of criminal defense practice would have been to demand a suppression hearing.

¶45 The State responds that Tucker has failed to satisfy the first prong of the *Strickland* test as he cannot demonstrate that his counsel was deficient for failing to request a hearing when the existing case law does not allow such a hearing. We agree with the State that counsel's performance was not deficient. For the reasons enumerated in Issue Two, the District Court was not required to hold a hearing on Tucker's motion to suppress. Although Tucker asserts a desire to challenge the "ill will and motives" of the informants, he nonetheless has not stated a challenge to the truthfulness of any of the factual statements in the application. Because Tucker is not invoking a *Franks* challenge to the application, counsel had no basis to request such a hearing. Tucker's motion to suppress was premised on the assertion that the application did not contain facts sufficient to establish probable cause. As this is a legal question that can be answered based on the four corners of the application, a suppression hearing was not necessary and defense counsel was not required, nor was there any need, to request a hearing.

¶46   Because Tucker has failed to satisfy the first prong of the *Strickland* test, we need not address whether the alleged deficiency prejudiced Tucker. *Adams*, ¶ 22. We hold that Tucker's counsel did not render ineffective assistance when he failed to request a hearing on Tucker's motion to suppress.

¶47   Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS